# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUENTRELL E. WILLIAMS,

                     Plaintiff,                      OPINION AND ORDER

      v.

                                                       14-cv-871-wmc

NICHOLAS BUHR, *et al.*,

                     Defendants.

---

This court granted *pro se* plaintiff Quentrell Williams leave to proceed under 42 U.S.C. § 1983 on his claims that defendants Nicholas Buhr, Gary Maier, Michael Meisner and Candace Warner acted with deliberate indifference to Williams' serious medical and mental health needs despite his having already engaged in multiple acts of self-harm. Pending before the court are defendants' Motion for Summary Judgment (dkt. #21), defendants' Motion to Dismiss for failure to prosecute (dkt. #36), and Williams' motion to voluntarily dismiss this lawsuit without prejudice (dkt. #39). Each motion to dismiss will be denied, but the court will grant defendants' motion for summary judgment, given that the undisputed facts do not support a finding that any of the named defendants acted with deliberate indifference. Accordingly, judgment will be entered in defendants' favor.[1]

At the outset, the court briefly will address the two dismissal motions. As to

---

[1] Williams' opposition to defendants' motion included a six-page response to their proposed findings of fact and numerous filings from an unrelated lawsuit. (Dkt. #31.) Construing this filing as a mistake, the court gave Williams multiple opportunities to respond more fully. (Dkts. # 32, 35.) Most recently, the court warned Williams that his failure to supplement his filing would result in the court taking the motion under advisement as is. (Dkt. #35.) As Williams still did not file a corrected response, the court is doing just that.

defendants' motion to dismiss, Fed. R. Civ. P. 41(b) permits the court to dismiss an action for failure to prosecute, but this "is an extraordinarily harsh sanction, to which courts should resort only in extreme situations, where there is a clear record of delay or contumacious conduct, or whether other less drastic sanctions have proven unavailable." *Dunphy v. McKee*, 134 F.3d 1297, 1299 (7th Cir. 1998). The court agrees that Williams' has not been diligent in his efforts to litigate this matter, but beyond Williams' failure to oppose their motion for summary judgment, defendants have not submitted any facts that would suggest that Williams has abandoned this lawsuit or taken steps that appear to be deliberate attempts to delay it. Accordingly, while the court is ultimately closing this matter in defendants' favor, it will do so on the merits and not failure to prosecute grounds.

For his part, on May 19, 2017, Williams filed a motion to voluntarily dismiss without prejudice all of his actions before this court. Federal Rule of Civil Procedure 41(a)(2) provides in relevant part: "Except as provided in Rule 41(a)(1) an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." The court has discretion to either grant or deny a motion to voluntarily dismiss action without prejudice. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 177 (7th Cir.1994) (citing *FDIC v. Knostman,* 966 F.2d 1133, 1142 (7th Cir.1992)). At this stage, dismissal without prejudice would be improper.

Williams states that he is temporarily in custody at the Dane County Jail, away from all of his legal materials that are currently located in Osceola, Iowa. He explains that he has to serve an 84-day probation sanction in jail and does not want his lawsuits to be dismissed due to his failure to prosecute them. Yet Williams does not explain why

the court should not address the merits of defendants' motion for summary judgment, nor does he indicate that he had any plan to respond further to the merits of that motion. Given that defendants have already established that they are entitled to summary judgment, which has now been pending for several months and for which Williams has been given numerous earlier opportunities to respond, dismissal of this lawsuit now, without prejudice, would serve only to unnecessarily delay this dispute to the obvious prejudice to defendants. Accordingly, Williams' motion to dismiss also will be denied, and the court turns to defendants' motion for summary judgment.

UNDISPUTED FACTS[2]

I.      **Parties**

From October 16, 2013, to January 21, 2014, Williams was an inmate at Columbia Correctional Institution ("CCI"). He was released from Wisconsin Department of Correction's ("DOC") custody on March 1, 2016.

Defendants are all DOC employees. Michael Meisner was CCI's warden from April 2011 to March 2014. Dr. Gary Maier worked as CCI's psychiatrist from June 2009 to March 2016. Dr. Nicholas Buhr was a licensed psychologist at CCI when Williams was housed there. Candace Warner is a registered nurse who works as the Health Service Manager at the New Lisbon Correctional Institution ("New Lisbon"). For a brief period in early 2014, she also acted as CCI's "Assistant Interim Health Services Manager," although she was never stationed there. Finally, Jane Doe is an unnamed CCI nurse.

---

[2] Unless otherwise noted, the following facts are material and undisputed, viewing the underlying evidentiary support submitted by both sides in the light most favorable to Williams for any disputed proposed findings of fact.

## II.    Psychiatric Evaluations at CCI

Before arriving at CCI, Williams had been housed at DOC's Secure Program Facility ("WSPF"), where he had been in and out of clinical observation.  He had also been evaluated at length by psychiatric staff outside WSPF, including the DOC's Psychiatric Director and one of its consulting psychologists.  The consensus of WSPF's psychological services unit ("PSU") staff, as well as outside staff, was that Williams was a malingerer motivated to engage in behavior that he believed would convince staff that he suffers from a serious psychosis "so that he can be transferred to a different institution and/or . . . allege deliberate indifference."

Shortly after arriving at CCI in October of 2013, Williams received a psychological evaluation, including visits by psychological staff on October 23, 28 and 30.  The records from those visits also note that his behavior was consistent with "malingered, or exaggerated, psychiatric illness" and that he had previously been diagnosed as malingering.  (PSU Record, dkt. #23-1, at 2-3.)  At that time, however, CCI's staff did not go so far as to diagnose him formally as a malingerer.[3]  (*Id*.)

On November 18, 2013, Williams submitted a PSU service request.  When Dr. Norge, a Psychological Associate, visited Williams at that time, he told Norge that he needed to go to observation and was hearing voices telling him to harm himself.  He also told him that he had a history of cutting, overdosing and eating glass.  Williams then began pacing his cell.  Dr. Norge tried discussing coping skills with Williams, who kept walking away from the cell door.  At that point, Dr. Norge decided to put Williams in

---

[3] To malinger means to report symptoms that an individual does not experience for some unknown gain.

clinical observation status and ordered staff observation every 15 minutes.[4]

As one of CCI's psychologists, Dr. Buhr visited Williams at approximately 8:30 a.m. on November 19, 2013. Before his visit, Dr. Buhr reviewed Williams' file, noting that he had previously made self-harm threats and had suicidal thoughts, but that he had been able to remain safe. Dr. Buhr also noted that when Williams reported hearing voices and experiencing hallucinations, his reports were not consistent with the typical presentations of such symptoms: Williams did not have difficulty dealing with current events; he did not appear to be responding to the hallucinations; and his reports about the hallucinations were inconsistent. Finally, Buhr noted the malingering comments and previous diagnosis, which concluded that there was a reasonable probability that he was feigning psychological illness.

When Dr. Buhr arrived at his cell, Williams was sleeping, and when awoken, Williams stated that he did not want to talk. Dr. Buhr told him that if they did not talk, he could not assess his safety. Williams replied, "Fine with me."

After that interaction, Dr. Buhr ordered that Williams' current status continue with observation every 15 minutes. At approximately 3:00 p.m. and 4:30 p.m. that day, November 19, Williams again requested to be seen, which Dr. Buhr did. During those visits, Williams reported hearing voices and stated that similar symptoms had led to his committing acts of self-harm in the past. Although Dr. Buhr attempted to discuss past treatment and coping strategies, Williams repeatedly stated that he did not feel he was

---

[4] "Clinical observation" is a status that restricts movement and property rights of an individual to limit their exposure to some of the most common items used in cases of self-injury. Inmates placed in clinical observation status are generally observed by security staff either every 15 minutes or constantly with one-on-one supervision. PSU staff members conduct routine rounds in the segregation units during which they review the inmate's file, go to his cell and talk to the inmate.

receiving treatment. He specifically stated that he had done his part, and it was now PSU's responsibility to help him, which, according to Dr. Buhr, is a common indicator of someone who is not motivated for treatment. Additionally, after discussing his hallucinations, Dr. Buhr continued to believe that Williams may be feigning those symptoms because he was not responding to the voices or reporting them consistently. Williams eventually agreed to try basic distress-tolerance skills to focus away from concerns about his mood and hearing voices. Because Williams did not indicate he could keep himself safe, he still reported hearing voices, and he only agreed to attempt coping exercises at the end of the interaction, Dr. Buhr again concluded that Williams should remain on clinical observation status with observation every 15 minutes.

The next day. November 20, 2013, at approximately 9:40 a.m., Dr. Buhr followed up with Williams to review his observation placement. Williams reported that "nothing changed from yesterday"; he was still hearing voices and feared for his safety. As a result, Dr. Buhr continued Williams' observation status on the same 15 minute intervals.

Dr. Buhr saw Williams the next day, November 21, 2013, at approximately 1:30 p.m. This time, Williams reported that he was doing "fine" and did not have an urge to engage in self-harm. Although he reported occasional thoughts of self-harm, Williams also stated they were low in intensity and he felt he could control them. Williams denied having any plan to engage in self-harm, and he said that his mood had improved from the previous days. Dr. Buhr and Williams also discussed treatment, and Williams agreed to see the psychiatrist. Finally, Williams agreed that if he began to have the urge to self-harm, he would inform staff as he had done previously.

At that point, Dr. Buhr noted several signs he believed put Williams in the low

risk category for self-harm: (1) denial of high intensity thoughts of self-harm; (2) denial of self-harm plan; and (3) the presence of future orientation, making future plans, discussing positive changes in mood and active participation in treatment. As a result, Dr. Buhr ordered that Williams be removed from clinical observation status and returned to a regular segregation cell. After his release from observation status, Williams met with Dr. Maier, CCI's resident psychiatrist, that same day about medication. Dr. Maier treated his first examination of Williams on November 21, 2013, as a follow-up to the psychiatric assessment by Dr. Knuppel, the psychiatrist who saw Williams at WSPF.

Before making his assessment, Dr. Maier spoke with Dr. Buhr about Williams' initial assessment, and he reviewed Williams' records. Like Dr. Buhr, Dr. Maier noted multiple comments by other caregivers at CCI that Williams may be malingering psychosis. In particular, he reviewed Dr. Knuppel's April 23, 2013, report, in which he stated his belief that Williams was highly motivated to convince staff that he had a psychiatric condition that would: (1) disqualify him from placement at WSPF, requiring his transfer; and/or (2) permit him to bring a lawsuit alleging that prison staff were deliberately indifferent to his condition. Dr. Knuppel made a similar note on June 11, 2013, because Williams had been in and out of clinical observation status.

When Dr. Maier met with Williams, he told Dr. Maier that he was depressed and hearing voices. When Dr. Maier gave him the choice between taking medication for his depression or the voices, Williams stated that he wanted to address the voices. In describing the voices, Williams stated that he hears three voices: a male voice named Jimmy who he converses with and a male and female voice, both of whom say negative things to him. Williams also reported taking various psychotropic medications in the

past, including one that had helped, but he could not remember the name of the medication. Williams became argumentative when Maier told Williams that those types of voices are not typical of a person suffering from a serious mental illness, such as schizophrenia, and that it was atypical for Williams not to remember a medication if it helped with voices.

Despite suspecting that Williams was malingering psychosis, Dr. Maier decided to take Williams at his word and discussed a medication plan with him. Maier prescribed thiothixene, an antipsychotic used to treat symptoms of schizophrenia. Specifically, Dr. Maier directed Williams to take a 5 milligram tablet of thiothixene by mouth at night as needed, with a follow-up in two weeks. After Williams told Dr. Maier about his ongoing lawsuit against WSPF, and Dr. Maier assured him that he was devoted to his care and would not let the lawsuit affect Williams' treatment. At that time, even though Williams had told Dr. Maier that he has thoughts of self-harm when he gets depressed, Dr. Maier also noted that Williams was not harboring thoughts of harming himself.

### III. November 22, 2013, Suicide Attempt

Despite this, the following morning, November 22, 2013, Williams received a razor for shaving; he broke the razor to access the blade; and then cut his arms and neck. When staff responded, Williams further swallowed the razor blade. Staff then took him to Divine Savior Hospital for x-rays, which were sent to UW Hospital for a surgical consult on removing the razor.

Upon his return to CCI, Dr. Buhr ordered that Williams be placed back on

observation, and he went to meet with him. At that point, Williams told Dr. Buhr, "When I shit this blade out I will finish the job." Williams also said he wanted to kill himself the day before, but he needed something with which to do it. Although Dr. Buhr attempted to engage him further, Williams told him he did not want to talk, instead laying down on his mattress. Accordingly, Dr. Buhr upped his status to constant one-on-one observation. Ultimately, Williams was taken to UW Hospital to have the razor blade removed.

## IV.    December 2013 Hunger Strike

On November 25, 2013, Dr. Buhr received a PSU form from Williams that was dated November 21. On it, Williams wrote that he continuously writes slips about hearing voices, getting depressed, starting to fear for his well-being and safety, and wondering when he would receive treatment. Dr. Buhr responded by reminding him: (1) how he had been frequently seen at least daily by PSU staff since November 18, including by Buhr himself; and (2) an individual appointment had already been scheduled him for November 22, which he missed as a result of his swallowing the razor blade.[5] Williams remained in clinical observation status until December 9, 2013, when he was placed in disciplinary segregation.[6]

On December 11, 2013, Dr. Maier saw Williams for his follow-up appointment. Williams told him that his antipsychotic medication was somewhat helpful and asked about increasing the dosage to 10 milligrams. Dr. Maier agreed in order to try to form a

---

[5] The record does not indicate that Dr. Buhr had any further contact with Williams.

[6] The record does not indicate who made the decision to remove him from observation.

positive relationship with him, even though he still suspected that Williams was malingering. Afterwards, Williams complained of difficulty sleeping, so Dr. Maier prescribed diphenhydramine to help him sleep.

Williams remained in disciplinary segregation until December 18, when he again reported suicidal ideation, then tied a sheet around his neck and attempted to choke himself. After that incident, Williams was placed back in clinical observation status.

Later on December 18, 2013, while under observation, Williams reported that he planned to go on a hunger strike after supper. He then refused food and water from that point until December 25. As a result, a nutritional monitor remained on the unit and follow up was scheduled. During that week, Williams suffered from dehydration and dizziness and he briefly lost consciousness as a result.

## V.    December 26, 2013, Overdose

Even though Dr. Maier prescribed Williams' sleep medication in liquid form as a precautionary measure, nothing about his interactions with Williams led him to believe he would attempt an overdose. He simply did not want Williams to save up his medication so that he *could* overdose. After receiving the prescriptions, Williams never submitted any health service requests asking to be seen by psychiatry, nor did he voice any concerns about his medication.

Nevertheless, on December 26, 2013, Williams overdosed on his medication, taking 16 ten-milligram thiothixene pills. After learning about the overdose that same day, Dr. Maier cancelled the thiothixene prescription. On January 15, 2014, Dr. Maier went to Williams' cell door, but Williams was sleeping and did not want to wake up. As

Williams was sleeping during the day, Dr. Maier suspected that it was unlikely he still needed the diphenhydramine, but decided not to cancel that prescription because it is not dangerous. Instead, he scheduled a follow-up for two weeks. Because Williams was transferred to the Green Bay Correctional Institution on January 30, 2014, however, Dr. Maier did not see him again.

## VI.    Williams' Interactions with Meisner and Warner

While Michael Meisner was the warden at CCI, he was responsible for instituting all DOC policies and procedures at an institutional level. Meisner did not, however, supervise day-to-day operations of individual employees, with the exceptions of the Human Resources Director, Inmate Complaint Examiner, the warden's Secretary and the Corrections Management Services Director. For medical and mental health care treatment in particular, Meisner is neither a physician nor a psychologist, and he relied on the professional opinions and expertise of the health care staff. At CCI, Meisner never exercised day-to-day supervisory control over HSU or PSU staff, and he never had control over their diagnostic and treatment decisions. While Meisner is the reviewing authority for inmate complaints, Williams never filed any offender complaints related to his medical or mental health care at CCI. Although Meisner is informed of observation placements, he defers to the professional judgment of PSU staff to determine the appropriateness of placement in, and removal from, observation status.

Specifically, while he would have been notified about Williams' placement on observation status, the November 22 suicide attempt and hospitalization, the December 18 attempt to choke himself, and the December 26 overdose after those events occurred,

Meisner had no other information related to Williams' mental health. More importantly, Meisner was never involved in Williams' medical and mental health care.

Finally, throughout Williams' incarceration, defendant Warner was working in her position at New Lisbon as the Health Services Manager. As of January 13, 2014, Warner did work as an assistant interim Health Services Manager at CCI, and she held this position until May of 2014, but she was never located at CCI, and even in her role at New Lisbon, she had very little hands-on patient care. As a result, she was unaware of any of the above events.

OPINION

The court granted Williams leave to proceed on his Eighth Amendment deliberate indifference claims against: (1) Nurse Warner for failing to respond properly to his December hunger strike; (2) Warden Meisner for failing to act, even though he knew that Williams' was not receiving proper care; (3) Dr. Buhr for releasing Williams from observation status; (4) Dr. Maier for prescribing him thiothixene in pill form, despite his history of overdosing; and (5) Nurse Jane Doe for failing to respond to Williams' hunger strike. At summary judgment, defendants seek judgment as to Jane Doe because Williams failed to substitute a known party in for that defendant. Defendants further contend that neither Meisner nor Warner had sufficient personal involvement to permit them to be held culpable under the Eighth Amendment. Finally, defendant assert that the undisputed facts show Dr. Buhr's and Dr. Maier's psychiatric treatment was sufficient to preclude a reasonable juror from finding that either acted with deliberate indifference to Williams' mental health needs.

## I.    Lack of Involvement by Doe, Meisner and Warner

The court can resolve the Jane Doe issue swiftly.  The preliminary pretrial conference order entered in this case directed Williams to file an amended complaint that identified defendant Jane Doe by March 7, 2016.  (Dkt. #15, at 4.)  The order further warned Williams that the failure to file such a motion may result in dismissal of his claim against her.

While Williams sought and received discovery as to Jane Doe, he failed to file an amended complaint by the deadline, later seek leave to file an amended complaint or even respond to defendants' argument that she should be dismissed.  Given that the court has provided Williams multiple opportunities to pursue his claim against Jane Doe, and he has failed to follow through each time, the court must consider this claim abandoned.  Accordingly, defendants' motion as to defendant Jane Doe will be granted.

As for Nurse Warner and Warden Meisner, a defendant must have been personally involved in depriving a plaintiff of his constitutional rights to be liable under § 1983.  *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009).  An official is only sufficiently involved if:  (1) he or she acted or failed to act with a deliberate or reckless disregard of the plaintiff's rights; *or* (2) the conduct causing the constitutional deprivation occurred at his or her direction or with his or her knowledge or consent.  *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985).  For this reason, supervisors cannot generally be held liable for the conduct of a subordinate that violates an individual's constitutional rights.  *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001).  An exception to this general rule arises where a supervisor either:  (1) has some personal involvement in the deprivation; *or* (2) is "essentially directing or consenting to the challenged conduct."  *Doyle v. Camelot*

*Care Ctrs., Inc.*, 305 F.3d 603, 614-15 (7th Cir. 2002) (citing *Chavez*, 251 F.3d at 651). Defendants argue that neither Warner nor Meisner can be held liable under § 1983 because neither were sufficiently personally involved in his medical or mental health care. The court agrees.

Williams' claim against Nurse Warner is the more threadbare of the two as it depends on a claim that she was deliberately indifferent to Williams' hunger strike on December 18, 2013. She cannot be liable under § 1983 for the simple reason that she was not located at CCI when Williams went on the hunger strike, nor was she informed about it at that time. Therefore, she was not in a position to make any decisions about Williams' care during his December hunger strike. Indeed, Warner did not even begin serving as the assistant interim Health Services Manager for CCI until the beginning of January, well after Williams' hunger strike ended. Accordingly, defendants' motion will be granted as to Warner.

Similarly, Meisner was neither personally involved in Williams' care, nor can he be held accountable based simply on his position as the warden. First, Meisner may have been informed that Williams had been placed on observation status, and about Williams' suicide attempts albeit after the fact, but Williams has submitted no facts suggesting that Meisner was involved in his treatment in a more in-depth manner. Nor does he dispute the appropriateness of Meisner's deference to PSU staff in handling these matters. This makes sense. Warden Meisner may have had the ultimate authority over PSU staff, but he was neither a doctor nor pharmacist. Accordingly, he lacked the requisite legal authority or practical knowledge to question Dr. Buhr's or Dr. Maier's decisions about Williams treatment.

With respect to the November suicide attempt in particular, Meisner had already been informed that Williams was on observation status, so Meisner relied on the professional judgment of the staff to take appropriate measure to protect him. Nothing in the record suggests that this placement -- or removal from it -- required Meisner to take additional steps to ensure Williams' safety.

While the December choking attempt and overdose are closer calls, they are only marginally so. Defendants acknowledge that Meisner was informed about Williams' November suicide attempt, so it is arguable that Meisner was on notice that Williams may attempt to commit suicide again. On the other hand, it is undisputed that Meisner does not typically second-guess the professional judgment of PSU staff's observation status decisions, and nothing in the record suggests that Meisner failed to take reasonable steps in response to Williams' observation placements.

The results may have been different if Williams had reached out to Meisner specifically and sought different treatment from him, but the facts here do not suggest that Williams even attempted to involve Meisner in his treatment, so there is nothing that would suggest that Meisner failed to respond appropriately. *See Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) ("Deliberate indifference requires a showing of 'more than mere or gross negligence'[;] . . . . it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'") (citations omitted). Accordingly, the simple fact that Meisner was informed that Williams was placed on observation status, then later learned about his suicide attempts, are not sufficient to hold him culpable under § 1983.

Nor can Meisner be held liable as a superior because none of the events

surrounding Williams' care suggest that any of his subordinates' treatment of Williams was at his instruction, nor that PSU staff completely failed to follow prison policies and Meisner knew about it. *See Steidl v.* Gramley, 151 F.3d 739, 741 (7th Cir. 1988). In fact, as will be explained below, even if Meisner *was* personally involved in Williams' treatment, the undisputed facts would not permit a jury to infer that any of the defendants were deliberately indifferent.

## II. Treatment Decisions by Doctors Buhr and Maier

The court permitted Williams to proceed against Doctors Buhr and Maier on the theory that their treatment of his mental health needs constituted deliberate indifference. The Eighth Amendment imposes a duty on prison officials not only to provide "humane conditions of confinement," but to insure that "reasonable measures" are taken to guarantee inmate safety and prevent harm. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). An inmate may prevail on a claim under the Eighth Amendment by showing that the defendant acted with "deliberate indifference" to a "substantial risk of serious harm" to his health or safety. *Id.* at 836. Here, defendants rightly concede that Williams' suicide attempts, hunger strike and overdose constituted serious medical harm,[7] but contend that the undisputed facts would not allow a reasonable jury to infer that any of Dr. Buhr's or Dr. Maier's actions constituted deliberate indifference.

Deliberate indifference to a risk of self-harm is present when an official is subjectively "aware of the significant likelihood that an inmate may imminently" harm himself, yet the offical "fail[s] to take reasonable steps to prevent the inmate from

---

[7] Attempted suicide and other forms of significant self-harm constitute such harm. *See Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010).

performing the act." *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775-76 (7th Cir. 2014) (citations omitted). *See also Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies.").

This is more than medical malpractice; the Eighth Amendment does not codify common law torts. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.") In particular, an inmate's, or even another doctor's, disagreement with a medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997). While deliberate indifference requires more than negligent acts, it also requires something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety," or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference." *Id*. at 837.

A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). Here, the undisputed evidence precludes a reasonable

jury from making that inference as to either Drs. Buhr's or Meier's actions.

### A.    Dr. Buhr

Even if his decisions may not have been perfect in retrospect, Dr. Buhr's treatment was responsive and readily defensible.   He visited Williams for the first time on November 19, the day after Williams was placed on observation status.   Although Williams' history caused Dr. Buhr to suspect that he may be malingering psychosis, he neither ignored Williams' statements nor responded inappropriately to his concerns. Rather, Dr. Buhr kept him on observation status after visiting him on November 19 twice and on November 20 once.   Moreover, Dr. Buhr only removed him from observation status after Williams reported on November 21 that he could control his low intensity thoughts of self-harm, denied that he had a self-harm plan and showed a positive mood change.

Given the undisputed change in Williams' behavior and attitude, as well as lengthy history and recent presentment of malingering, it was not patently unreasonable for Dr. Buhr to take him at his word on November 21 that he neither had a plan nor an inclination to harm himself.   Indeed, Dr. Buhr only removed him from observation status after being convinced that Williams was sincere in these statements.   Under the circumstances, no reasonable trier of fact could fault Dr. Buhr for failing to forecast that Williams actually would attempt self-harm or discern Williams was lying, at least when his words and actions suggested otherwise.  *See Sanville v. McCaughtry*, 266 F.3d 724, 736 (7th Cir. 2001) (in exercising judgment, professionals cannot "practice with a crystal ball in hand").   Although Williams may now fault Dr. Buhr's professional judgment with the

benefit of hindsight, his judgment at the time was is presumptively valid. *See Estate of Cole v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996). Even if it were not, the record of ongoing treatment and assessments, as well as reasonable justifications for removing Williams from observation status, were simply too measured and careful to constitute the type of gross negligence necessary for a reasonable jury to find that Dr. Buhr acted with deliberate indifference. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Snipes v.* DeTella¸95 F.3d 586, 592 (7th Cir. 1996) (disagreement with medical decisions does not amount to a constitutional claim unless the treatment "is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition"). Accordingly, the court will grant defendants' motion as to Dr. Buhr.

## B.    Dr. Maier

Similarly, neither Dr. Maier's prescription of pills, rather than a liquid form of thiothixene, nor his response to his hunger strike, were enough for a reasonable jury to find he acted with deliberate indifference. First, none of Dr. Maier's meetings with Williams before his December 26 overdose suggested that he might attempt self-harm through an overdose. Second, given Williams' self-report that he had previously taken at least one psychotropic medication that had helped, it was not unreasonable for Dr. Maier to believe medication may be helpful again. Third, even though he doubted Williams' sincerity in reporting hallucinations, Dr. Maier treated him as though his symptoms were actually occurring to gain some level of trust, yet proceeded with caution by prescribing only a low dose of thiothixene. Fourth, when Williams later told him that the 5

milligram dosage was not working, Dr. Maier chose once again to take Williams seriously, but only increased his dosage a small amount.

Even if any of those actions were negligent -- and there is nothing in this record to suggest they were, even with the benefit of hindsight -- no reasonable jury could find Dr. Maier's measured approach evidenced deliberate indifference. Tellingly, as the party with the burden of proof, Williams has submitted *no* evidence suggesting that during his interactions with Dr. Maier, Williams acted in a way that should have led Maier to believe that he would overdose.

While Williams did report a history of overdosing when he arrived at CCI, and the court will assume that Dr. Maier's review of his file included this fact, this is offset by Williams' history of malingering to manipulate his placement and support lawsuits. Moreover, Dr. Maier took precautions against another overdose: he believed that he was prescribing a safe level of thiothixene *and* prescribed a liquid form of the sleep aid medication to avoid the potential for Williams to hoard his medications. While the decision to provide Williams *any* medications could be questioned in light of his history of overdosing, Dr. Maier's decision that these prescriptions were appropriate in the interest of fostering a healthy relationship with Williams is not something a civil jury can reasonably second-guess, much less find evidence of deliberate indifference.

Finally, as for Williams' one-week hunger strike in late December 2013, no evidence suggests that Dr. Maier knew that Williams was experiencing dizziness, dehydration and lost consciousness or that he failed to respond appropriately. Rather, the evidence suggests that CCI's HSU staff were both aware of the hunger strike and responded appropriately without involving Dr. Maier or any other member of CCI's

PSU.  The court will, therefore, grant defendants' motion as to Dr. Maier.

ORDER

IT IS ORDERED that defendants' Motion to Dismiss for failure to prosecute (dkt. #36) is DENIED, Williams' motion to voluntarily dismiss without prejudice (dkt. #39) is DENIED, and defendants' Motion for Summary Judgment (dkt. #21) is GRANTED. The clerk's office is DIRECTED to enter judgment for defendants and close this case.

Dated this 22nd day of May, 2017.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge